UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JO-BET, INC., GARTER BELT, INC.,
HAMILTON'S HENRY THE VIII LOUNGE,
HAMILTON'S BOGART, INC., JOHN
HAMILTON, JOHN HAMILTON, JR.,
JEREMY HAMILTON, MICHAEL HAMILTON,
JOHN L. HAMILTON RETAINED ANNUITY          Case No. 01-CV-74698
TRUST,
                                           HONORABLE AVERN COHN
                    Plaintiffs,

v.

CITY OF INKSTER, PAUL MARTIN, KENNETH
BROWN, and ANTONY ABDULLAH,

                    Defendants.
_____/

### MEMORANDUM AND ORDER
### (1) DISMISSING THE CITY OF INKSTER AS A DEFENDANT, (2) DISMISSING ALL FIRST AMENDMENT CLAIMS, (3) DISMISSING JOHN HAMILTON, THE JOHN L. HAMILTON RETAINED ANNUITY TRUST, JOHN HAMILTON, JR., JEREMY HAMILTON, AND MICHAEL HAMILTON AS PLAINTIFFS, (4) DISMISSING PLAINTIFFS' TAKINGS CLAIM, (5) DISMISSING PLAINTIFFS' CONVERSION CLAIM, (6) DISMISSING PLAINTIFFS' LARCENY CLAIM, and (7) GRANTING SUMMARY JUDGMENT  IN FAVOR OF ANTONY ABDULLAH, PAUL MARTIN and KENNETH BROWN

### I.    Introduction[1]

This is civil rights case under 42 U.S.C. §§ 1983 and 1985(2) with pendent state law

claims.  Broadly stated, Plaintiffs claim that defendants conspired to deprive them of their

_____

[1] The Court originally scheduled this matter for hearing.  Upon review of the parties' papers, however, the Court finds that oral argument is not necessary.  See E.D. Mich. LR 7.1(e)(2).

1

right to operate sexually oriented businesses ("SOBs"); namely, four strip clubs.[2]  Plaintiffs seek injunctive relief and damages.

Plaintiffs are as follows:

(1) Jo-Bet, Inc., d/b/a Henry the VII South – An adult entertainment establishment located in the City of Southgate.

(2) The Garter Belt, Inc., d/b/a Legg's Lounge ("Leggs") – An adult entertainment establishment located in Van Buren Township ("VBT").

(3) Hamilton's Henry VIII Lounge, Inc. - An adult entertainment establishment located in the City of Inkster.

(4) Hamilton's Bogart, Inc., d/b/a Bogart's Joint - An adult entertainment establishment located in the City of Inkster.

(5) John Hamilton - Sole stockholder of the above-listed corporations.

(6) John Hamilton Trustee of the John L. Hamilton Retained Annuity Trust.

(7) John Hamilton, Jr. – John Hamilton's son.

(8) Jeremy Hamilton – John Hamilton's son.

(9) Michael Hamilton – John Hamilton's son.

---

[2] SOB is defined as

an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, sexual encounter center, or similar establishment, or any place that permits patrons to be filmed or photographed performing "sexually explicit activities" or displaying "specified anatomical areas" for electronic transmission over the World Wide Web.

See VBT Ex. 2 p. 7.

Strip club is defined by Wikipedia as "a nightclub or bar that offers striptease (the erotic removal of a performer's clothing) and possibly other related services such as lap dances."

2

The defendants who remain party to this case are: (1) the City of Inkster, (2) Detective Paul Martin (Martin), (3) Detective Kenneth Brown (Brown), and (4) Officer Antony Abdullah (Abdullah).  However, in their response brief, Plaintiffs admit that they have no viable claim against the City of Inkster: "After extensive discovery[,] the Plaintiffs acknowledge that the City [of Inkster] defendant does not have a municipal policy or custom that has violated their constitutional rights."  In light of this concession, all claims against the City of Inkster will be dismissed.  From this point forward, the term "City of Inkster Defendants," as used herein, is a reference to Brown, Martin, and Abdullah only. These three individuals are Inkster police officers who are being sued in their individual capacities.

The complaint currently governing this action is the Corrected Fourth Amended Complaint ("FAC").  See Dkt. 131.  On August 17, 2009, the Court issued an order in which it, among other things, granted summary judgment in favor of the Van Buren Township Defendants and the City of Romulus Defendants.  See Dkt. 333.  For the purposes of this memorandum and order, the Court will assume the parties' familiarity with its previous orders.

Now before the Court is the Inkster Defendants' Motion for Summary Judgment.  For the reasons that follow, the motion will be granted in full as to Abdullah and granted in part as to Martin and Brown.

## II.  Background

### A.

This case involves four strip clubs: (1) Henry the VIII South, owned by J-Bet, Inc., (2) Leggs Lounge ("Leggs"), owned by the Garter Belt, Inc., (3) Henry the VIII Lounge,

3

owned by Hamilton's Henry the VIII Lounge, Inc. ("Henry's"), and (4) Bogart's Joint ("Bogart's"), owned by Hamilton's Bogart, Inc.  John Hamilton (Hamilton) is the sole stockholder of the four corporations.  Generally, Plaintiffs' claims against the Inkster Defendants stem from allegations that the Inkster Defendants conspired among themselves, and with the Michigan Liquor Control Commission (MLCC), to put Hamilton's two Inkster strip clubs—Henry's and Bogart's—out of business.  However, at his deposition, Hamilton testified that there is no conspiracy involving the Inkster Defendants as to Bogart's:

> Q:   Okay.  And as far as Inkster and Bogart's, you don't have anything pending there, so there's no conspiracy as far as Bogart's concerned?
>
> A:   No.
>
> Q:   Correct?
>
> A:   Correct.
>
> * * * *
>
> Q:   Do you have any proof that anybody from Inkster at anytime through any means whatsoever tried to close Bogart's?
>
> * * * *
>
> A:   Nobody involved in the City of Inkster, no.

Hamilton Dep. (Dec. 11, 2006) at pp. 399, 496.  This testimony forecloses any conspiracy claim involving the Inkster Defendants to harm Bogart's.

**B.**

The main thrust of Plaintiffs' claims against the Inkster Defendants with regard to Henry's is that "Martin with Brown and Abdullah, set about to close Henry's" when they

allegedly planned and executed a bomb scare at Henry's on May 11, 2000. FAC at ¶ 124.

The purported facts underlying the bomb scare incident are set forth in Plaintiffs' FAC as

follows:

126.   On May 11, 2000, at approximately 3:00 p.m., Abdullah came into Henry's, out of uniform, and took a seat at a side stage. Abdullah drank "pop" and occasionally would leave his seat and walk toward the men's room.

127.   At approximately 4:30- 5:00 p.m., Elvie Gensoli, acting Manager and an employee of Henry's, received a call from an unidentified male stating that there was a bomb threat against Henry's and that the bomb was to explode at approximately 9:00 p.m. that night. Gensoli was instructed to close the doors to Henry's business and advised that new customers were not to enter.

128.   Ms. Gensoli inquired if this call was a "joke" and the caller said "no" but did not identify himself. When the caller hung up, Ms. Gensoli dialed "*69", redialed the number and when answered, was advised that this was a phone at the Inkster police.

129.   Approximately 20 minutes later, the Inkster Police Department arrived with a "bomb" dog. Brown advised Ms. Gensoli to tell customers that there was "carbon monoxide leaking" and that patrons and dancers were to exit the bar. In addition, Brown ordered Ms. Gensoli from the premises.

130.   Approximately 15 minutes after ordered out of the bar, Brown asked Ms. Gensoli to re-enter the bar and advised her that the explosives dog utilized by the City of Inkster "had found something" behind the bar and near the employees' bags. Officer Brown asked Ms. Gensoli to look around the bar to see if anything was out of place. This action was totally against acceptable police standards when faced with a bomb threat.

131.   Brown advised Gensoli again to exit the bar and that the unit would be bringing another dog to the scene to verify the presence or absence of a bomb.

132.   After a second delay of approximately 15 minutes, Brown again asked Ms. Gensoli to enter and this time asked for her keys to downstairs offices which were locked and had, at all times relevant, been locked. Brown stated that it was necessary to

check the downstairs office to insure that no bomb was present. Brown was advised that the downstairs area was and had been locked and not accessible to customers, but he insisted on the keys.

133.   At the insistence of Brown, Ms. Gensoli gave Brown keys to the office and the downstairs area. Brown then went downstairs.

134.   Approximately 10 minutes later, Brown exited the downstairs area, returned Ms. Gensoli's keys and had a video tape in his hand. Ms. Gensoli demanded that the tape be returned to her and that he did not have permission to take the tape. At this time Gensoli called E. Carol Paquette, manager of Henry's on her cell phone and Paquette told Brown not to take the tape. Neither Gensoli nor Paquette has any idea what else Brown may have taken.

135.   Despite demands by the agents and employees of Henry's, Brown took the tape and placed it in his police vehicle, refusing to return same.

136.   Shortly after Brown placed the tape in his police vehicle, a second dog arrived and, at a very few minutes, Brown advised Gensoli that the second dog didn't find anything.

137.   At this point in time, the dancers and patrons were allowed to return to the bar although most of the dancers and patrons had now left the scene. At this time, Brown told Gensoli to close the bar, although no indication of a bomb had been found and the "bomb squad" never arrived.

138.   One of the waitresses re-entered the bar with Paquette and others. This waitress had noticed Abdullah, as set forth earlier in this Complaint, when he had first entered at approximately 3:00 but did not know that he was a police officer. When she returned inside of Henry's, she noted that Abdullah was sitting at the bar with Brown. At this point in time, the waitress heard Brown say to Abdullah: "So you decided to do it today and I was going to do it tomorrow."

139.   When Abdullah and Brown saw the waitress, they discontinued their conversation. Subsequently, on August 3, 2000, Abdullah again came to the bar and the waitress learned Abdullah's identity. The waitresses remember Abdullah in part because he did not tip.

6

140.  The City of Inkster Police Department records incoming calls such as bomb threats and Plaintiffs are informed and believe that the call was made as a subterfuge and further believe that it was made by Abdullah.

141.  As police officers, Brown, Abdullah and Martin are also enforcement agents for the MLCC.

142.  At no time on May 11, 2000, did Brown, Abdullah or any other member of the Inkster Police Department have a warrant to search Plaintiffs' property or seize any property therefrom and the taking of property from Plaintiffs' premises was over objection of Henry's agent and employee.

143.  After taking the tape from Henry's, Brown reviewed the tape, found nothing regarding the bomb threat and placed it in his desk drawer for return to Henry's. However, Martin, in furtherance of the conspiracy to put Hamilton out of business, entered Brown's desk drawer, took the tape and then filed a formal complaint with the MLCC claiming that the tape recording showed violations of Rule 436.1411(1).

144.  Neither Henry's agents or employees nor Hamilton saw the tape before it was seized.

145.  Hamilton contacted the Inkster Police Department, advised that the tape had been unlawfully taken and further advised the MLCC that the tape had been taken.

146.  Assistant Attorney General Courtney Smith was advised that the tape had been taken illegally, that the tape would reveal that the statements of the officers were false and perjurious and was advised that it made no difference whether the officers were committing perjury or whether the tape had been illegally seized.

* * * *

151.  Hamilton was advised that the rules of evidence did not apply in Administrative hearings in the State of Michigan and whether the tape was illegally seized or not, the Commission could make a determination of culpability.

152.  In furtherance of the conspiracy to put Hamilton out of business, Brown, Abdullah and Martin testified falsely, in direct contradiction of the physical evidence: to wit, the tape

recording showing their entry and actions at Henry's on May 11, 2000.

* * * *

154.   Martin subsequently recanted portions of his testimony, claiming mistake.

FAC at ¶¶ 126-146, 151-152, 154.

The person or persons responsible for executing the bomb scare have never been identified.  Moreover, the videotape, which was initially taken by Brown and subsequently sent to the MLCC by Martin, was used as evidence in connection with liquor license violation proceedings against Henry's before the MLCC.  The Michigan Court of Appeals has adjudicated the issue of whether the videotape was admissible in those proceedings, answering the question in the affirmative.  See Hamilton's Henry the VIII Lounge, Inc. v. Dep't of Consumer & Industry Servs., et al., No. 255893, 2006 WL 2035617 (Mich. Ct. App. July 20, 2006) (per curiam).  The Michigan Supreme Court denied leave to appeal, thus ending the litigation.  See Hamilton's Henry the VIII Lounge, Inc. v. Dep't of Consumer & Industry Servs., et al., 728 N.W.2d 438 (Mich. 2007).

### III.  Dismissal of Individual Plaintiffs and First Amendment Claims

Before addressing the Inkster Defendants' Motion for Summary Judgment, the Court first addresses the right of the individual plaintiffs to sue.  As stated above, plaintiffs are four corporations, four individuals, and one trust.  As stated by the Fifth Circuit and quoted with approval by the Sixth Circuit in Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862 F.2d 597, 602-603 (6th Cir. 1988),

> [t]he general rule is, of course, well established that an action to redress injuries to a corporation, whether arising out of contract or tort, cannot be maintained by a stockholder in his own name but must be brought in the name of the corporation, since the cause of action

> being in the corporation, the stockholder's rights are merely derivative and can be asserted only through the corporation. The general rule is applicable in cases where the individual is the sole stockholder.

Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5th Cir. 1968) (footnote omitted).

Moreover,

> it is universal that where the business or property allegedly interfered with by forbidden practices is that being done and carried on by a corporation, it is that corporation alone, and not its stockholders (few or many), officers, directors, creditors or licensors, who has a right of recovery, even though in an economic sense real harm may well be sustained as the impact of such wrongful acts bring about reduced earnings, lower salaries, bonuses, injury to general business reputation, or diminution in the value of ownership.

Martens v. Barrett, 245 F.2d 844, 846 (5th Cir. 1957) (footnotes omitted) (quoted with approval by the Sixth Circuit in Canderm Pharmacal, Ltd., 862 F.2d at 603).

This case involves several claims; however, plaintiffs do not clarify which claims are brought by which plaintiffs. Applying the law discussed in the preceding paragraph, it is clear that the individual plaintiffs and the trust lack standing to assert a conspiracy claim, or any other claim to redress injuries to the corporate entities, because their rights are, at best, derivative of those of the corporate entities.

However, the individual plaintiffs may properly bring a claim that defendants violated their freedom to associate under the First Amendment because that is a claim belonging to them and not the corporate entities. However, the Court will summarily dismiss the First Amendment claim because the individual plaintiffs claim that their right to associate was violated—not by any of the defendants who remain party to this action— but rather by the MLCC, a former defendant with which plaintiffs have settled. See Dkt. 330.[3]  As the

---

[3] The Court notes that the individual plaintiffs baldy assert in the FAC that their right to associate was violated by the Inkster Defendants. However, in their brief, they

individual plaintiffs and the trust assert claims against a former defendant who is no longer party to this action, they are no longer appropriate plaintiffs herein. Therefore, John Hamilton, the John L. Hamilton Retained Annuity Trust, John Hamilton, Jr., Jeremy Hamilton, and Michael Hamilton will be dismissed as plaintiffs for lack of standing. From this point forward, "Plaintiffs," as used herein, refers only to the corporate plaintiffs.

## IV.  Analysis

Plaintiffs assert six claims against the Inkster Defendants: (1) conspiracy, (2) First Amendment violations, 42 U.S.C. § 1983, (3) 42 U.S.C. § 1985(2), (4) conversion,[4] (5) taking, and (6) larceny. The Court has already adjudicated the First Amendment claim. See supra at p. 9 n.3. The Court shall address the remaining claims, in turn, below.

### A.  Conspiracy

#### 1.  Law

state that their "freedom to associate claim comes from the MLCC's acts to only grant liquor licenses to John Hamilton's sons if they agreed to a stipulation that neither John Hamilton or their mother could be present at or assist in the management of the son's businesses." Pls.' Br. at 5. The individual plaintiffs have not sufficiently alleged or proven that the Inkster Defendants had anything to do with the stipulation referenced in the preceding sentence, much less that there was an agreement among the Inkster Defendants, on the one hand, and the MLCC, on the other hand, to deprive the individual plaintiffs of their rights. Hamilton even admitted during his deposition that he has no evidence that anyone associated with Inkster interfered with his family relationship or right of association. See Hamilton Dep. (Dec. 11, 2006) at pp. 497-498. To the extent the individual plaintiffs argue that the Inkster Defendants are liable under the First Amendment because they are the MLCC's co-conspirators, this argument fails because the individual plaintiffs have offered only conclusory allegations and no evidence in support of such an extraordinary claim.

[4] Plaintiffs do not specify whether they intend to bring a common law conversion claim or a statutory conversion claim or both. In their brief, they discuss law relating to both causes of action, intermingling the two. Moreover, Plaintiffs discuss their "takings" claim and their conversion claim as if they are one claim.

As stated by the Sixth Circuit, the standard for proving a conspiracy under § 1983 is as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.  All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

Hooks v. Hooks, 771 F.2d 935, 943-944 (6th Cir. 1985).

The standard is similar under Michigan law: "A conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means."  Fenestra Inc. v. Gulf Am. Land Corp., 141 N.W.2d 36, 48 (Mich. 1966).  Additionally,

> at the core of an actionable civil conspiracy is a question of damages.  This facet of the law of conspiracy is accurately summed up in the case of Roche v. Blair: "The law is well established that in a civil action for damages resulting from wrongful acts alleged to have been committed in pursuance of a conspiracy, the gist or gravamen of the action is not the conspiracy but is the wrongful acts causing the damages.  The conspiracy standing alone without the commission of acts causing damage would not be actionable.  The cause of action does not result from the conspiracy but from the acts done."  In the case of Auto Workers' Temple Ass'n v. Janson, the point is made more succinctly: the foundation of the action is the damage and not the conspiracy.

Id. at 48-49 (citations omitted).  See also 16 Am. Jur. 2d Conspiracy § 53 ([t]he gist of a civil conspiracy is not the unlawful agreement, but the damage resulting from that agreement or its execution.  The cause of action is not created by the conspiracy, but by the wrongful acts done by the defendants to the injury of the plaintiff, and a conspiracy is actionable only if the overt acts done pursuant to the common design proximately cause

damage to the party bringing the action" (footnotes omitted)).  Additionally, "no cause of action can exist in the absence of an overt, tortious, or unlawful act committed in furtherance of the conspiracy."  16 Am. Jur. 2d at § 52 (footnote omitted).

## 2. The Parties' Arguments

### a. Plaintiffs' Claims

Plaintiff assert conspiracy claims against the Inkster Defendants as follows:

> 221.  The City of Inkster, Martin, Brown and Abdullah, and unknown members of the Inkster Police Department, agreed among themselves and the other named Defendants, in their individual capacities, to act to put Plaintiffs out of business and to further the overall objective of the conspiracy.

> 222.  Martin, Brown and Abdullah, acting under color of law, with the illegal search and seizure, under the alleged bomb threat, was to injure Henry's and to remove protected First Amendment businesses from the City of Inkster, without appropriate legislation, and to deprive Hamilton of his First Amendment rights and to deprive him of his ownership of Henry's and Bogart's, including his investment in each.

FAC at ¶¶ 221-222.  In their response brief, Plaintiffs summarize the evidence of a conspiracy involving the Inkster Defendants as follows:

> (1) That the Inkster Defendants, among themselves, created a plan to harass or shut down Henry's. The overt acts include the false bomb threat by Abdullah, which "justified" a search under false pretenses by Brown, who stole a tape, which was obtained by Martin, who then made a complaint to the MLCC, which was supported by perjured testimony;

> (2) That the Inkster Defendants conspired with the MLCC to shut down Hamilton's businesses.  The overt acts include the above and the MLCC's eagerness to use evidence obtained unconstitutionally and supported by perjured testimony.

### b. The Position of the Inkster Defendants

The Inkster Defendants make a number of arguments in support of their position that

12

Plaintiffs' conspiracy claim is not viable.  One of their arguments is that Plaintiffs have not suffered any monetary damages – a necessary element of a conspiracy claim.

### c.  Plaintiffs' Counter-Argument

Plaintiffs do not dispute the Inkster Defendants' position regarding the non-existence of monetary damages in this case.  Rather, Plaintiffs contend that monetary damages are not a necessary element of a conspiracy claim.  In support of their position, Plaintiffs rely upon Bloch v. Ribar, 156 F.3d 673, 679 (6th Cir. 1998) (emphasizing that injuries in the context of a § 1983 claim need not be monetary but rather may include impairment to reputation, personal humiliation, and mental anguish).

### 3.  Discussion

As stated above, "a conspiracy is actionable only if the overt acts done pursuant to the common design proximately cause damage to the party bringing the action."  16 Am. Jur. 2d at § 53 (emphasis added).  Here, Plaintiffs state that the overt act in furtherance of the conspiracy was the false bomb threat.  Pls.' Br. at 4.  Thus, in order to sustain a conspiracy claim premised upon the bomb scare, Plaintiffs must show that the bomb scare caused damages.  As Plaintiffs correctly note, the damages need not be monetary.

Plaintiffs have not shown that they suffered any damages, monetary or otherwise, arising out of the bomb scare incident.  First, Plaintiffs do not dispute the contention of the Inkster Defendants that no monetary damages were suffered from the bomb scare incident. Moreover, while Plaintiffs argue that the damages do not have to be monetary, they fail to show that they suffered any non-monetary damages.  Because Plaintiffs have failed to offer any evidence of damages resulting from the purported overt act done in furtherance of the alleged conspiracy, their conspiracy claim fails.

13

## B.  42 U.S.C. § 1985(2)

### 1.  Law

Generally, "42 U.S.C. § 1985 provides a private cause of action for conspiracy to interfere with civil rights."  Molnar v. Care House, 574 F. Supp. 2d 772, 787 (E.D. Mich. 2008).  Specifically, § 1985(2) states as follows:

> If two or more persons . . . conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

42 U.S.C. § 1985(2).

The first clause of § 1985(2) "prohibits conspiracies to influence parties, witness, or jurors in federal court proceedings."  Fox v. Mich. State Police Dep't, 2006 WL 456008, *3 (6th Cir. Feb. 24, 2006).  "The second clause of § 1985(2) creates a cause of action against 'two or more persons' who 'conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws. . . .'  Dallas v. Holmes, 2005 WL 1313801, *6 n.5 (6th Cir. May 12, 2005) (citing  42 U.S.C. § 1985(2)). "Under this clause . . . a plaintiff must demonstrate that there was 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'"  Id. (citing Kush v. Rutledge, 460 U.S. 719, 726 (1983)).

14

## 2.  Plaintiffs' Claims

Plaintiffs assert claims under § 1985(2) against the Inkster Defendants as follows:

233.    As set forth above, after the initial complaint was filed, Inkster police officers continued to harass the dancers and patrons at Henry's and Bogart's.

234.    That with the filing of the complaint in December of 2001, law enforcement officers of the City of Inkster have sought, contrary to 42 U.S.C. 1985 (2), to obstruct justice and intimidate witnesses and parties.

235.    Police officers of the City of Inkster have and are approaching dancers and patrons and are intimidating same so as to force the dancers or patrons to testify in favor of the respective units of government and the Defendants associated therewith, and/or to refrain from testifying on behalf of Hamilton or the Plaintiff corporations and to deprive Hamilton and the corporations of equal protection of the law.

236.    The conduct of the Inkster Defendants, in particular the law enforcement arms of Defendants, to intimidate witnesses and obstruct justice, will continue if they are not restrained and it will become impossible for Plaintiffs to present their case to this Court and Plaintiffs will be irreparably harmed as will the cause of justice and an injunction is necessary to prohibit Defendants from further harassment, intimidation and obstruction.

FAC at ¶¶ 233-236.

## 3.  Discussion

While Plaintiffs discuss the law surrounding a § 1985(2) claim in their brief, they fail to apply the law to the facts of this case.  The Court interprets Plaintiffs' failure in this regard as a tacit acknowledgment that no viable § 1985(2) claim exists against the Inkster Defendants.  Although Plaintiffs have made very bald statements in their FAC, they have failed to proffer even a shred of evidence in support of their claim.  The Court will grant summary judgment in favor of the Inkster Defendants on the § 1985(2) claim because it lacks any arguable basis in law or fact, is entirely unsupported by any evidence, and is

frivolous.

### C. Conversion and Taking[5]

#### 1. Law

"Under Michigan law, conversion is defined generally as 'any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.'" Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc., 264 F.3d 622, 637-38 (6th Cir. 2001) (quoting Sarver v. Detroit Edison Co., 571 N.W.2d 759, 761 (Mich. App.1997)). "The general rule for the measure of damages for conversion is the value of the converted property at the time of the conversion." Ehman v. Libralter Plastics, Inc., 523 N.W.2d 639, 639-640 (Mich. Ct. App. 1994) (citing Baxter v. Woodward, 158 N.W. 137 (1916)).

#### 2. Plaintiffs' Claims

The factual basis underlying Plaintiffs' conversion claim, as described by Plaintiffs in their FAC, is as follows:

> 238.   The individual named Inkster police officers, at all times mentioned herein, owed a duty to Plaintiffs not to steal, take, convert, interfere with Plaintiffs' business, commit malfeasance or violate Plaintiffs' civil rights.  In each count listed hereinafter, including the instant count, the individual police officers breached their duty to Plaintiffs and Plaintiffs were injured.  The conduct of the officers is not within the scope of their authority, not permitted by the Constitutions of the State of Michigan or of the United States and the individual police officers have no

---

[5] In their brief, Plaintiffs discuss these two claims as if they are one claim.  Insofar as Plaintiffs intend to assert two distinct causes of action, the takings claim will be dismissed because (1) it has not been separately briefed and (2) Plaintiffs have not explained what cause of action is intended.

In addition, as noted above, Plaintiffs have not specified whether they intend to bring a common law conversion claim or a statutory conversion claim or both.  The Court will assume that Plaintiffs intended to bring both claims.  The common law conversion claim is addressed in the body of this memorandum while the statutory claim is addressed in footnote six.

immunity of any nature.

239.   The City of Inkster has no immunity. The City of Inkster had knowledge of the misconduct of the individual police officers and ratified and sanctioned their actions, violated, under color of law, Plaintiffs' constitutional and statutory rights, and the City of Inkster has no immunity in each count listed hereinafter, including the instant count.

240.   Defendants have converted Plaintiffs' property for their own use and have exercised wrongful dominion over Plaintiffs' property without Plaintiffs' authorization or consent and upon demand has refused to return Plaintiffs' property and all copies that may have been made of the tape.

241.   As a result of Defendants' actions, Plaintiffs have been damaged and injured in a sum in excess of $75,000 including loss of business, injury to reputation, attorney fees as it relates to the September 11, 2000 Administrative Hearing.  Plaintiff Hamilton's investment in Henry's has been impaired and he has lost income as a result of Defendants' actions and conversion.

242.   As a result of the actions and conversion of the officers of City of Inkster, Hamilton has been injured by a sum in excess of 1 million dollars.

FAC at ¶¶ 238-242.  The Court notes at the onset that the conversion claim is poorly pled inasmuch as Plaintiffs have not even specified in the FAC what specific property was allegedly converted.

In their brief, however, Plaintiffs clear up the confusion.  According to Plaintiffs,

the Inkster Defendants conspired together to take the tape or approve and adopt the taking of the tape.  Abdullah made the false bomb threat, Brown took the tape without permission, and Martin used the converted tape to make MLCC complaints.  Martin clearly approved and ratified the taking of the tapes (as did the MLCC) by viewing it and sending the tape to the MLCC.  Martin also converted the tape to his own use by removing it from Brown's drqwer [sic]. Presumably, Martin also received some gain from the conversion, even if only kudos from his employer or the MLCC. Therefore, all of the Inkster Defendants are liable for the conversion.

17

Moreover, Hamilton states in his deposition that the tape is the only property allegedly converted.  <u>See</u> Hamilton Dep. (Dec. 11, 2006) at p. 508.  For relief on their conversion claim, Plaintiffs seek "1 million dollars plus costs, interest and attorney fees plus punitive damages."  <u>See</u> FAC at p. 43.

### 3.  The Position of the Inkster Defendants

The Inkster Defendants argue that the conversion claim fails against Abdullah because there is no evidence that he was involved in the taking of the tape.  As to the conversion claims against Brown and Martin, the Inkster Defendants argue that Plaintiffs cannot establish that they are entitled to the damages sought and that the claims should therefore be dismissed.  Importantly, however, the Inkster Defendants do <u>not</u> argue that Martin and Brown are not liable for conversion; they only argue that Plaintiffs are not entitled to the damages they seek.

### D.  Discussion

The common law conversion claim against Abdullah fails for the reason given by the Inkster Defendants – the record does not contain evidence that Abdullah handled the tape or otherwise had anything to do with taking it.  Rather, Plaintiffs allege that Brown initially took the tape from Henry's, <u>see</u> FAC at ¶¶ 134-135, and that Martin subsequently took the tape from Brown's desk drawer and sent it to the MLCC.  <u>See id</u>. at ¶ 143.  Although Plaintiffs claim a conspiracy between the three officers to take the tape, there is no evidence in  support of such a claim as it relates to Abdullah.  That is, Plaintiffs have offered no proof that there was an agreement between Abdullah, on the one hand, and Martin and Brown, on the other hand, with regard to the taking of the tape.

Regarding the common law conversion claims against Martin and Brown, the Court

agrees with the Inkster Defendants that Plaintiffs are not entitled to the relief they seek.

Hamilton testified as follows regarding the basis for the conversion claim:

> Q:   What personal property have [the Inkster Defendants] taken from you?
>
> A:   Just the tape.
>
> Q:   Is the tape worth $1 million?
>
> A:   Cost me that much.
>
> * * * *
>
> Q:   Okay.  You don't know the value of the tape; correct?
>
> A:   No.
>
> Q:   Would you rely on your accountant or attorneys for the estimation of the value of that tape?
>
> A:   I'm sure they are basing it on the fact of the loss and everything else, yes.
>
> Q:   So really not the value of the physical tape itself, you're referring to its, the effect that that tape had after the tape was taken, is that your claim?
>
> A:   Right.

Hamilton Dep. (Dec. 11, 2006) at pp. 508-509.  Thus, it is clear that the basis for the

damages sought is not the value of the tape, but rather the trouble caused by the tape

when it was admitted in the proceedings before the MLCC as evidence of liquor license

violations at Henry's.  However, this is not how damages are measured in the context of

a conversion claim.  "The general rule for the measure of damages for conversion is the

value of the converted property at the time of the conversion." Ehman, 523 N.W.2d at 639-

640 (citing Baxter, 158 N.W. at 137). Here, Plaintiffs have not established that anything

other than the general rule should apply.  Therefore, if Plaintiffs can establish the elements

19

of a common law conversion claim against Brown and Martin, they are entitled to nominal damages in the amount of the fair market value of the tape at the time it was taken – probably a dollar or two, at most.  Because Plaintiffs do not seek nominal damages for the fair market value of the videotape, but rather seek much more extensive damages to which they are not entitled, the common law conversion claim will be dismissed.[6]

### D.  Larceny

Larceny is a crime and not a private cause of action.  "[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  Diamond

---

[6] In their brief, Plaintiffs cite law relating a statutory conversion claim.  "In addition to the common-law [conversion] claim, Michigan provides a statutory cause of action against those who aid in the conversion of property."  Entech Personnel Servs., Inc. v. Feliciano Transport, Inc., 2004 WL 2889874, *6 (Mich. Ct. App. Dec. 14, 2004) (per curiam) (emphasis added).  As explained by the Michigan Court of Appeals,

> Statutory conversion is provided for at MCL 600.2919a.  Pursuant to MCL 600.2919a, a person who is damaged as a result of another person's buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property when the person buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted, may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney's fees . . . .  MCL 600.2919a is not designed to provide a remedy against the individual who has actually stolen, embezzled, or converted the property, as the actions proscribed—buying, receiving, or aiding in the concealment—all occur after the property has been stolen, embezzled, or converted by the principal.

Palazzolo v. Nitzkin, 2005 WL 221431, *3 (Mich. Ct. App. Jan. 7, 2005) (emphasis in original).  Here, to the extent Plaintiffs assert a statutory conversion claim against Martin and Brown, the claim is not cognizable because Plaintiffs allege that both were principals, i.e., the people who actually did the stealing, and "MCL 600.2919a is not designed to provide a remedy against the individual who has actually stolen."  Id.  To the extent Plaintiffs assert a statutory conversion claim against Abdullah, the claim fails because there is no evidence that he bought, received, or aided in the alleged concealment of the tape.

v. Charles, 476 U.S. 54, 64 (1986); see also Providence Baptist Church v. Hillandale Comm., Ltd., 425 F.3d 309, 317 (6th Cir. 2005).  "[T]he general rule is that a private cause of action is not maintainable under a criminal statute." Am. Postal Workers Union v. Indep. Postal Sys. of Am., 481 F.2d 90, 93 (6th Cir. 1973); see also Ticor Title Ins. Co. v. Nat'l Abstract Agency, 2007 WL 2710113, **9-10 (E.D. Mich. Sept. 13, 2007) (granting summary judgment because "the statutes for larceny and embezzlement are bare criminal statutes containing no indication that a private right of action is available").  Plaintiffs' larceny claim is frivolous and must be dismissed for failure to state a claim.

## V.  Conclusion

For the reasons stated above:

1.     All claims against the City of Inkster are DISMISSED.

2.     The First Amendment claims asserted by the individual plaintiffs are DISMISSED.

3.     John Hamilton, the John L. Hamilton Retained Annuity Trust, John Hamilton, Jr., Jeremy Hamilton, and Michael Hamilton are DISMISSED as plaintiffs.

4.     The takings claim asserted against the Inkster Defendants is DISMISSED.

5.     The conversion claim asserted against the Inkster Defendants is DISMISSED.

6.     The larceny claim asserted against the Inkster Defendants is DISMISSED.

7.     Summary judgment is granted in favor of Abdullah, Martin, and Brown. All claims against these defendants are DISMISSED.

SO ORDERED.[7]

         s/ Avern Cohn
        AVERN COHN
        UNITED STATES DISTRICT JUDGE

Dated:  August 26, 2009

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 26, 2009, by electronic and/or ordinary mail.

         s/ Julie Owens
        Case Manager, (313) 234-5160

---

[7] This memorandum and order, together with the memorandum and order of August 18, 2009 (Dkt. 333), disposes of the case.